UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

IN RE:                                                                          Chapter:    7
                                                                                Case No.:   08-31457

**MICHAEL FRANCIS PUSATERI, III**

SS:    XXX-XX-1888

          Debtor.

---

**CONGRESSIONAL FEDERAL CREDIT UNION**

                    Plaintiff,

v.
                                                                                Adversary No.: 08-03149

**MICHAEL FRANCIS PUSATERI, III**

                    Defendant.

---

**DEFENDANT'S SUPPLEMENTARY EVIDENCE IN SUPPORT OF DEFENDANT'S RESPONSE AND COUNTERCLAIMS IN OPPOSITION TO PLAINTIFF'S MOTION FOR VOLUNTARY DISMISSAL OF SECOND AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

Defendant Michael Pusateri, upon receipt of the deposition transcripts for Plaintiff's witnesses in this matter, respectfully submits this Supplement in support of his claims:

**Plaintiff's Deposition Witnesses:**

**Karen McGinn**

Karen McGinn has been employed at the Congressional Federal Credit Union for the past ten years. Ms. McGinn had held her current position, Internal Auditor, for approximately three months prior to her deposition in this matter. Prior to becoming internal auditor, Ms. McGinn worked for the Congressional Federal Credit Union in the Bankruptcy Department, Collections Department, and Member Services and directly reviewed Mr. Pusateri's file upon receipt of the bankruptcy filing and referred same to Roderick Angus, attorney for the Credit Union.

**La-Kiesha Pennnycooke**

La-Kiesha Pennycooke has been employed with the Congressional Federal Credit Union since

October 15, 2005. Ms. Pennycooke was hired to fill the Collections Manager position and remained in that position at the time of her deposition in this matter. She supervised Ms. McGinn and Mr. Wishard.

**John Wishard**

John Wishard is the legal recovery expert for Congressional Federal Credit Union. He has held this position since January, 2009. He took over Mr. Pusateri's file at the time he was hired for this position.

**Defendant's Claim (Lack of Screening):**

Plaintiff, without basis, and applying an arbitrary and capricious account screening process that considered only one (1) factor, i.e. the member's Visa charges of $1,000.00 or more within 90 days of a contract default, filed this adversary proceeding objecting to the dischargeability of all prepetition charges totaling $33,845.30 incurred by Michael Pusateri on his Visa credit card.

**Plaintiff's Deposition Testimony in Support of Defendant's Claim**

- Deposition of Karen McGinn, Excerpt Pages 11-13
- Deposition of Karen McGinn, Excerpt Pages 21-22
- Deposition of Karen McGinn, Excerpt Page 40
- Deposition of La-Kiesha Pennycooke, Excerpt Page 39
- Deposition of La-Kiesha Pennycooke, Excerpt Pages 43-44
- Deposition of La-Kiesha Pennycooke, Excerpt Pages 56-58

**Defendant's Claim (No Basis for Allegations of Insolvency/Inability to Pay):**

Neither Plaintiff, nor its Counsel had any basis for the allegations that Mr. Pusateri was insolvent and did not have the ability to repay his debts.

- Deposition of La-Kiesha Pennycooke, Excerpt Page 13
- Deposition of La-Kiesha Pennycooke, Excerpt Page 14
- Deposition of La-Kiesha Pennycooke, Excerpt Page 38

**Defendant's Claim (Lack of Pleading Specificity/No Factual or Legal Research Into Allegations):**

Plaintiff and its Counsel simply alleged that **all** charges made by Michael Pusateri, regardless of the amount of the charge or the nature of the charge, were nondischargeable under 523(a)(2)(A) without even paying lip service to the Plaintiff's burden to identify the specific purchases. Neither Plaintiff, nor its Counsel, reviewed Mr. Pusateri's credit history with CFCU, his preferential car payment to CFCU of $17,000, his spotless credit history with other creditors, the medical basis for his inability to work necessitating the filing of his bankruptcy case. Additionally,

Plaintiff and its Counsel, in its three (3) Complaints employed a "boilerplate" mentality to the extent of fictionalizing a credit application's overstatement of income when the actual document indicated "N/A" as Gross Income, indicated his excellent credit history and his then current bank account of $143,000.

**Plaintiff's Deposition Testimony in Support of Defendant's Claim**

- Deposition of Karen McGinn, Excerpt Page 16
- Deposition of Karen McGinn, Excerpt Page 36
- Deposition of La-Kiesha Pennycooke, Excerpt Page 30
- Deposition of La-Kiesha Pennycooke, Excerpt Page 53-54

## LACK OF SCREENING

### DEPOSITION OF KAREN MCGINN, EXCERPT OF PAGES 11-13

12   Q.   What else was done by you with regard to
13   Mr. Pusateri's case?
14       A.   Once I reviewed the Visa statement and
15   saw the charges, I turned it over to our attorney,
16   and that was the end of it for me.  Shortly
17   thereafter, I left the department.
18       Q.   Did you do anything other than review
19   the Visa charges and then refer it to the attorney?
20       A.   Not that I remember, no.  All he had was
21   a Visa.
22       Q.   Did you check to see if there were any
23   other accounts that he had had previously?
24       A.   No.  The only active account, the only
25   open account was that Visa credit card.

                                12
1        Q.   Did you didn't check the payment history
2   with any inactive accounts then?
3        A.   If it had a zero balance, we do not look
4   at it.  I did not look at it.
5        Q.   Did you look to see the length of the
6   member's relationship with the credit union?
7        A.   No.
8        Q.   The number of years?
9        A.   No.
10       Q.   Do you know what it was?
11       A.   No.
12       Q.   In making your decision to refer it to
13   the attorney for some action, do you consider the
14   amount of the debt?
15       A.   Not the total debt.
16       Q.   What do you consider if you don't
17   consider the total debt?
18       A.   The charges prior to the filing.  We
19   went back.  What's on the checklist is 60 days.  What
20   ends up being reviewed is more than that, 90.  Based
21   on that dollar amount, if a thousand was the limit,
22   anything more than a thousand would be referred.
23       Q.   When you say a thousand was the limit,
24   was that the member's limit or is that a guideline
25   that the credit union has, if the charge was over a

13
1  thousand, that prompts you to refer it?
2     A.   Cumulative charges, the balance of the
3  -- if the total number of charges, the total dollar
4  amount of the multiple charges, if it was in excess
5  of a thousand dollars, then it was an automatic
6  referral to the attorney for loading up, to review
7  for loading up.

**DEPOSITION OF KAREN MCGINN, EXCERPT OF PAGES 21-22**
10  Q.   Tell me what other decisions you make.
11  What other factors go into this other than what seems
12  to be the arbitrary thousand dollars purchases in 90
13  days.
14     A.   No.  It would be the thousand dollars.
15     Q.   That's the only factor?
16     A.   I believe that's what --
17     Q.   That's the only factor that you're aware
18  of?
19     A.   Correct.
20     Q.   You do not consider the history of the
21  member with the credit union.  Correct?
22     A.   Correct.
23     Q.   You do not consider the length of time
24  of the membership of the member with the credit
25  union.  Correct?

22
1     A.   Correct.

**DEPOSITION OF KAREN MCGINN, EXCERPT OF PAGE 40**
40
20     Q.   So we're back to if it's over a thousand
21  for anything, purchases on the credit card within 90
22  days prior to the filing, it's going to the attorney?
23     A.   Correct.

**DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 39**
39
6   Q.   The only reason that you elected to
7   refer the matter so that a member of your credit
8   union of over 13 years who had an impeccable credit
9   record during that period of time except for the last
10  month before the filing of the bankruptcy, the only
11  reason you referred it so that allegations could be
12  made that he defrauded the credit union was because
13  he used a credit card for more than a thousand for
14  anything, any purchases whether they were luxury or
15  otherwise, within 90 days prior to the filing and he
16  subsequently filed a bankruptcy; is that correct?
17     A.   Yes.

**DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 43-44**

43

23  Q.  Would it be fair to say that you dropped
24  back to the original one factor of purchases over a
25  thousand dollars within 90 days and said that's good

44

1  enough, go ahead with it?
2      A.  Yes.

**DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 56-58**

56

20  Q.  Let me ask you a hypothetical question.
21  This is certainly nothing that I would wish upon you
22  or anyone else.  Your family consists of you and your
23  husband?
24      A.  Immediate family, yes.
25      Q.  If, for some reason, maybe your husband

57

1  was laid off or something from work and the credit
2  union decided to cut back on the number of positions
3  and your employment was terminated, and even add to
4  that equation that one of you had a very serious
5  illness, and you had liquidated or tried to liquidate
6  all of your assets that you thought had any value
7  whatsoever to pay your debts.
8       What would your personal feelings be if you
9  had to file bankruptcy and read a complaint like any
10  of the three that have been filed in this case
11  accusing of you being a fraud, false pretenses,
12  lying, misrepresenting, things of that nature,
13  personal feelings?
14      A.  I wouldn't have any personal feelings.
15  I would just think that it's a business decision that
16  the credit union would have to make.
17      Q.  It wouldn't bother you in the least bit.
18  Right?

19      A.  Huh-uh.

20      Q.  You need to say no.  I see you shaking

21  your head.

22      MR. ANGUS:  You have to answer audibly.

23      THE WITNESS:  Oh, I'm sorry.  No, that

24  wouldn't bother me.  I mean, as a business, they

25  would have to make a business decision as to what is

58

1  good for them.
2  BY MR. BADGER:
3      Q.   Would you file a bankruptcy under the
4  circumstances I just outlined?
5      A.   If I didn't have a -- I guess,
6  hypothetically, if I didn't have any other way to
7  pay, yes, I would have to pay file.
8      Q.   So certainly in your case, and it's a
9  hypothetical case, it would be a course of last
10 resort?
11     A.   Yes.
12     Q.   And if you had explained the necessity
13 for taking this course of last resort to the credit
14 union and they still alleged these types of things in
15 complaints against you, it wouldn't bother you at
16 all?
17     A.   No.

**NO BASIS FOR ALLEGATIONS OF INSOLVENCY/INABILITY TO PAY**

**DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 13**

```
                              13
 8  BY MR. BADGER:
 9      Q.   Well, it says it is a fact there, and it
10  says that -- do you know of any facts that would
11  indicate that he did not intend to pay the credit
12  union?
13      A.   As far as being a fact, normally if you
14  file bankruptcy, then you don't intend to repay.
15      Q.   You don't intend to repay after you file
16  the bankruptcy?
17      A.   Yes.
```

**DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 14**

```
                              14
 3      Q.   At the time that Mr. Pusateri used the
 4  Visa card, what's the basis for your agreement with
 5  the statement that he lacked or did not intend to
 6  repay the credit union?
 7      A.   My only basis would be that he filed
 8  bankruptcy.
```

**DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 38**

```
                              38
19      Q.   Why didn't you ask for more information
20  before you filed a complaint alleging Mr. Pusateri
21  defrauded the credit union?
22      A.   Because based on his charges and based
23  on the bankruptcy filing, it basically states that
24  he's not able to repay his charges that he made.
```

| |
|---|
| **LACK OF PLEADING SPECIFICITY / NO FACTUAL OR LEGAL RESEARCH INTO ALLEGATIONS** |
| **DEPOSITION OF KAREN MCGINN, EXCERPT OF PAGE 16**<br>16<br>5    Q.   Did you look and have a concern about<br>6   any particular charges on the Plaintiff's Exhibit A?<br>7         MR. ANGUS:  If you remember.<br>8         THE WITNESS:  No.  It would have been all of<br>9   the charges. |
| **DEPOSITION OF KAREN MCGINN, EXCERPT OF PAGE 36**<br>36<br>15        MR. BADGER:  Well, the first question I was<br>16   going to ask her is on those two pages of charges,<br>17   which ones did you consider to be for luxury goods or<br>18   services?<br>19        THE WITNESS:  All of them. |
| **DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 30**<br>**(Witness is responding after 8 pages of Deposition Testimony wherein she stated that she would need "more information" with regard to individual charges)**<br><br>30<br>1   BY MR. BADGER:<br>2       Q.   And so you would need more information<br>3   as to each of those were before you could apply your<br>4   definition of luxury goods or purchases to it?<br>5       A.   Right. |
| **DEPOSITION OF LA-KIESHA PENNYCOOKE, EXCERPT OF PAGE 53-54**<br>53<br>19   Q.   Within your office, was it decided<br>20   between you and Melinda Edmonds that you would be the<br>21   one to testify rather than her for any particular<br>22   reason?<br>23        A.   Because I'm more familiar with what goes<br>24   on the Collections Department and what we have sent<br>25   over and things like that.<br><br>54<br>1       Q.   In your conversations with her<br>2   concerning this, the filing of the case and the<br>3   continuation of the case, she never mentioned<br>4   anything about her notes from the Credit Committee<br>5   for prior debts, good credit, good member, excellent<br>6   credit, had a hundred and some odd thousand dollars<br>7   in the bank account, etc.?<br>8       A.   No.<br>9       Q.   That wasn't factored in at all?<br>10      A.   No. |