FILED & JUDGMENT ENTERED
David E. Weich

Jun 30 2010

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 08-31457 |
| **MICHAEL FRANCIS PUSATERI, III** | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| **CONGRESSIONAL FEDERAL** | ) | |
| **CREDIT UNION** | ) | Adversary Proceeding No. |
| | ) | 08-3149 |
| Plaintiff. | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL FRANCIS PUSATERI, III** | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

In this credit card dischargeability action, the parties have filed cross summary judgment motions addressing whether Plaintiff Congressional Federal Credit Union ("CFCU") should be taxed with Debtor/Defendant Michael Pusateri's ("Pusateri") costs and attorneys fees under 11 U.S.C. § 523(d). Also before this Court is CFCU's motion to voluntarily dismiss the action.

1

That motion is not contested, but the dismissal decision has been deferred until the § 523(d) matter can be decided.[1]

The two summary judgment motions were heard on December 9, 2009, and thereafter by agreement converted into a trial on stipulated evidence. After receiving post hearing evidentiary submissions and sorting through disputes about the record, the § 523(d) issue is at last ready for adjudication.

## STATEMENT OF THE CASE

Pusateri was once a successful real estate broker who enjoyed a long, and unblemished borrowing history with his credit union, CFCU. However, after developing a serious back ailment and then enduring a botched operation, he found himself disabled. While Pusateri anticipated a return to work, his condition lingered and made a second operation necessary.

He adapted to his predicament and his mounting medical bills by scaling back his lifestyle and by paying off fixed debt. Pusateri also listed his luxury home for sale, with the intention of using its equity to pay other debt as well as his medical costs. Unfortunately, the national real estate bubble burst, making the home unsalable.

---

[1]*See* Amended Consent Order dated October 1, 2009, Docket No. 55.

Pusateri then ran out of money. For the first time, he missed a monthly payment on the CFCU credit card that he had continued to use while he was ill. Eight months after becoming disabled, and with no other options, Pusateri filed bankruptcy.

CFCU responded to the bankruptcy by filing this dischargeability action, boldly asserting that every outstanding charge on Pusateri's credit card account was based either upon false misrepresentations [Section 523(a)(2)(A)], a false financial statement [Section 523(a)(2)(B)], or a "luxury" purchase [Section 523(a)(1)(c)]. The Complaint is berefit of supporting factual allegations.

Pusateri and his counsel see CFCU's action as being extortionary. They responded with a motion to dismiss and a demand that CFCU be taxed with the debtor's costs and attorney's fees under § 523(d). A procedural brush fire broke out as Pusateri repeatedly attacked the complaint with motions to dismiss and CFCU in turn amended its pleading to abandon portions of the lawsuit. After several rounds, CFCU finally attempted to withdraw its action. The dispute then shifted to the question of whether CFCU was "substantially justified" in filing and prosecuting the action.

At each turn, the level of antagonism between the attorneys increased. Each side accused the other of acting unreasonably. Each responded to the other's 'unreasonableness' by redoubling

its own efforts. Presently, Pusateri's attorney's fees and costs total almost twice the original amount in controversy.

**Positions of the Parties**

Pusateri maintains that CFCU filed and prosecuted a meritless action in order to force a settlement of the debt owed from a debtor financially unable to litigate. He contends that the credit union and its attorneys filed a boilerplate complaint with little or no investigation of the account charges or of his personal circumstances. Pusateri acknowledges his costs and attorney's fees are high, but attributes this fact to CFCU's unreasonable litigation tactics. He asks that CFCU be taxed with all of his costs and fees.

CFCU counters that the large dollar amount of the card charges, made by an unemployed individual with a debilitating illness, demonstrate a lack of intent to repay, and thus fraudulent misrepresentation. Further, CFCU contends that it was reasonable for the same to believe many of Pusateri's charges were "luxury goods or services" without further investigation. Finally, CFCU acknowledges that since all of its allegations did not prove out, Pusateri should be allowed some small recovery under § 523(d). However, CFCU believes it is Pusateri who has litigated in an overly aggressive manner.

**Issues Presented**

(1) Was CFCU's filing and prosecution of its complaints "substantially justified" within the meaning of § 523(d); and

(2) Do "special circumstances" exist that would render an assessment of Pusateri's attorney's fees, costs, and expenses unjust?

**Holding**

1. CFCU was not substantially justified in filing and prosecuting this action. The action was filed upon little or no prior investigation and without regard to merit. CFCU's false misrepresentations count [§ 523(a)(2)(A)], false financial statement [§ 523(a)(2)(B)], and most of the "luxury" charges assertions [§ 523)a)(1)(C)] are factually unsupported. Only a small percentage of the 90 day charges on the credit card account could be considered by a reasonable person to be "luxury" purchases, particularly at the time the original complaint was filed and upon CFCU's then existing knowledge of the facts. Further, even after Pusateri pointed out the problems in the complaint, CFCU continued to pursue its action through two overbroad and ill conceived revisions to the complaint.

2. Apart from the appropriate level of defense costs, CFCU has failed to demonstrate "special circumstances" that would make taxing the same with Pusateri's reasonable defense costs

5

unjust. Admittedly, the Debtor's costs and attorney's fees are very high. However, in the main, this is due to CFCU forcing Pusateri to defend against a spurious dischargeability suit, and litigating the fee shifting request. Additionally, a sizeable part of the unnecessary litigation costs is attributable to the two attorneys whose efforts to best one another added considerably to the bill. For this, again, CFCU bears partial responsibility. However, since partial responsibility also lies with the Debtor and his counsel, the Court, will limit the fee shifting award.

## FINDINGS OF FACT

### I.   Pre-Bankruptcy Events

#### A. Background

Pusateri became a CFCU member in 1996. (Pusateri Depo., Docket No. 59, Ex. 2:14.) Over the ensuing twelve (12) years, Pusateri obtained credit from CFCU on seven (7) different occasions. (Pusateri Depo., Docket No. 59, Ex. 2:15.) His loans included a mortgage, one or more car loans, and two (2) Visa credit cards. (Pusateri Depo., Docket No. 59, Ex. 2:15-16, 110.) This adversary proceeding relates to Pusateri's non-revolving CFCU Visa card and the charges he made on this account between January 1, 2008 and July 16, 2008, the date Pusateri filed bankruptcy.

Pusateri was employed by Weichert Realtors as a real estate agent.[2] (Pusateri Depo., Docket No. 59, Ex. 2:9.) He also "flipped" (bought and resold) houses on the side. (Pusateri Depo., Docket No. 59, Ex. 2:72.) Pusateri's income fluctuated based upon the number and value of the real estate sales that he closed. His annual income ranged from $89,389.00 in 2007 to $222,658.00 in 2005 (Pusateri Depo., Docket No. 59, Ex. 2:75; Petition, Docket No. 1, Statement of Financial Affairs, Question No. 1.)

**B. Pusateri's Medical Issues.**

Pusateri suffered from chronic back pain since 1995. Even so, he was able to manage the pain and function normally. (Pusateri Depo., Docket No. 59, Ex. 2:43.) In December of 2007, Pusateri's back pain increased significantly, leading Pusateri to consult with a doctor. (Pusateri Depo., Docket No. 59, Ex. 2:43.) The back condition was so severe that Pusateri was unable to work, thereby preventing him from earning income. (Pusateri Depo., Docket No. 59, Ex. 2:34.)

Pusateri's doctor thought his condition could be remedied with a surgical procedure. Accordingly, Pusateri assumed he would soon be back to work. He underwent his first surgical

---

[2] Pusateri is still licensed as a real estate agent with Weichert Realtors. (Pusateri Depo., Docket No. 59, Ex. 2:10.)

procedure on January 3, 2008. (Pusateri Depo., Docket No. 59, Ex. 2:40.) Unfortunately, the operation was a failure.

Instead of obtaining relief, post surgery, Pusateri experienced increased pain levels. He was ordered by his physician to stay at home on bed rest. (Pusateri Depo., Docket No. 59, Ex. 2:45.) However, his condition did not improve.

Although Pusateri consulted several doctors, the source of his back problem was not discovered until April 2008, when Pusateri's physicians realized that he had a staph infection.

This necessitated a second, emergency operation, followed by a period of in-home nursing. (Pusateri Depo., Docket No. 59, Ex. 2:46-47.)

**C. Pusateri Scales Back his Lifestyle and Attempts to Shed Fixed Debt.**

As Pusateri's condition worsened and a return to work became more problematic, he rearranged his life style in order to reduce his expenses.

First, between January and March of 2008, Pusateri listed his house for sale at a below market price.[3] His goal was to attain a quick sale and realize the significant equity in the property. Pusateri planned to use these monies to retire debt and to pay his medical expenses. (Pusateri Depo., Docket No. 59,

---

[3] Pusateri's house had an appraised value of $1,570,000 (sales comparison approach) and $1,609,000 (cost approach). (Pusateri Depo., Docket No. 59, Ex. 2:101.) However, he listed it for sale at $1.39 million.

Ex. 2:37-39, 101.)   To his surprise, the house did not sell. (Pusateri Depo., Docket No. 59, Ex. 2:75.)

In April, Pusateri took further steps to lower his overhead. In addition to reducing his asking price for the home, Pusateri also decided to trade in his vehicle for a less expensive vehicle with easier accessibility. (Pusateri Depo., Docket No. 59, Ex. 2:49-50.) Pusateri's car loan was with CFCU, and like many borrowers, he was "upside down" on the obligation. When he attempted to trade in his vehicle, the dealer offered him less than the balance Pusateri owed CFCU on his car. (Pusateri Depo., Docket No. 59, Ex. 2:51, 82.) To make up the shortfall, Pusateri paid CFCU $17,000 out of his assets.[4] (Pusateri Depo., Docket No. 59, Ex. 2:51, 82.)

Similarly, Pusateri began retiring his other fixed debts. As reflected in his Statement of Financial Affairs, between April 16 and July 16, 2008, Pusateri repaid another $24,000 to his creditors, for a total of $41,000.  (Pusateri Depo., Docket No. 59, Ex. 2:82).

### D. Pusateri Runs Out of Options.

By mid 2008, the national housing malaise had reached the Charlotte metro area, making homes difficult or impossible to sell. As of June 2008, even at a discounted price, Pusateri's

---

[4] This payment to CFCU occurred on May of 2008, within 90 days of Pusateri's bankruptcy filing. (Pusateri Depo., Docket No. 59, Ex. 2:82.)

luxury home had not sold. Further, Pusateri remained sick and unable to work.

At this point, Pusateri realized that he had no way of paying his mounting medical bills and his other debts. Lacking other options, Pusateri met with an attorney to discuss bankruptcy. (Pusateri Depo., Docket No. 59, Ex. 2:35.)

Despite his illness, Pusateri was still current on his debts. He had never incurred any late charges or payment defaults on any of his credit accounts, including those with CFCU. (Pusateri Depo., Docket No. 59, Ex. 2:74-75.) Even as to his $6,638 per month mortgage payment (also owed to CFCU), Pusateri was current. (Pusateri Depo., Docket No. 59, Ex. 2:80.)

Pusateri's unblemished credit record ended in June 2008 when he was unable to make the monthly payment on his CFCU credit card. In July 2008, Pusateri defaulted for the first time on his American Express, Bank of America, Chase and Discover card accounts.  (Pusateri Depo., Docket No. 59, Ex. 2:74.) He filed for bankruptcy relief on July 16, 2008. (Voluntary Petition under Chapter 7, Docket No. 1. of base case.)

**E.   The Prepetition CFCU Visa Charges.**

Believing his health and financial problems to be temporary, Pusateri had continued to use, and to make payments on, his CFCU Visa card while he was ill. Thus, as of the date of bankruptcy, he owed CFCU a balance of $33,845.30. (Voluntary

Petition under Chapter 7, Schedule F, Docket No. 1. of base case.)

The diagram below shows the overall card usage during this time period:

| Date | Number of Charges | Total Dollar Amount of Charges |
|------|-------------------|--------------------------------|
| 1/1/08 – 1/18/08 | 16 | $1,258.09 |
| 1/18/08 – 2/18/08 | 39 | $5,164.76 |
| 2/18/08 – 3/18/08 | 27 | $2,318.02 |
| 3/18/08 - 4/18/08 | 3 | $122.95 |
| 4/18/08 – 5/18/08 | 16 | $1,431.50 |
| 5/18/08 – 6/18/08 | 24 | $2,188.60 |
| 6/18/08 – 7/18/08 | 2 | $146.90 |
| 7/18/08 – 8/18/08 | 1 (Post-petition) | $6.95 |
| **Total for 2008** | **128** | **$12,637.77** |

## II. PostBankruptcy Events & the CFCU Adversary Proceeding

### A. The Bankruptcy Base Case.

Before filing the adversary proceeding, CFCU was relatively inactive in the base case. The credit union made little or no

effort to investigate Pusateri's use of the credit card or the circumstances leading to his bankruptcy.

Neither CFCU nor its counsel, ("Angus"), attended Pusateri's creditors meeting held in Charlotte on August 20, 2008. (Pl.'s Mem. Supp. Summ. J., Docket No. 58.). CFCU did hire local counsel prior to the dischargeability bar date of October 20, 2008 (Pl.'s Mem. Supp. Summ. J., Docket No. 58.), and she obtained a consensual extension of the deadline. (Order of Nov. 3, 2008, Docket No. 12). However, CFCU subsequently only had limited communications with Debtor's counsel, ("Badger") about the account. This communication was basically limited to CFCU apprising Mr. Badger that it believed Pusateri's credit card debt to be nondischargeable, and Badger replying in writing to briefly describe the health problems that led to his bankruptcy filing. (Motion for Summary Judgment, Ex:1, Docket No. 59).

Apart from this, there is no other evidence of CFCU's effort to investigate. In addition to not attending the creditors' meeting, CFCU elected not to conduct a Rule 2004 examination of the debtor. Nor did it seek elaboration about, or further confirmation of, his circumstances. As noted below, CFCU also failed to analyze Pusateri's account charges or activity on his other accounts.

**B. CFCU Files the Adversary Proceeding.**

Instead, barely two weeks after obtaining an extension of time, CFCU filed a Complaint objecting to dischargeability of its credit card debt. (Compl. Filed Nov. 19, 2008, Docket No. 1. Despite Pusateri's excellent credit history on its loans, CFCU maintained in the Complaint that the entire $33,845.30 outstanding balance owed was nondischargeable, including the $21,207.53 that was outstanding before he ever became ill.

CFCU's original Complaint was premised on three (3) contentions:

> A. The entirety of Pusateri's debt to CFCU, or all 128 charges, was the product of (1) false pretenses, false representations or actual fraud under 11 U.S.C. § 523(a)(2)(A).(Compl., Docket No. 1.);
>
> B. Pusateri induced CFCU to extend credit by furnishing it with materially false information in his credit applications and supporting documentation under 11 U.S.C. § 523(a)(2)(B) (Compl., Docket No. 1); and
>
> C. All of the charges made within ninety (90) days of bankruptcy were for luxury goods or services and nondischargable under 11 U.S.C. §  523(a)(2)(C)(i)(1). (Compl., Docket No. 1.).

The complaint brazenly characterized CFCU's entire debt as nondischargeable. However, the pleading was a "boilerplate" complaint entirely bereft of factual averments.

**C.  Pusateri's Response to the Adversary Proceeding and Proceedings in the Case.**

Incensed by what he and his counsel considered to be an extortionary action, Pusateri countered on January 16, 2009 with a Motion to Dismiss and Answer. (Answer, Docket No. 7.) Among many other objections, Pusateri asked that the Complaint be dismissed due to its failure to plead fraud with particularity. He alternatively demanded that CFCU be required to provide a more definite statement for each of the assertions in its Complaint. (Answer, Docket No. 7.)

CFCU apparently agreed with some of Pusateri's accusations. Before a hearing could even be held on the motion, CFCU unilaterally[5] filed an Amended Complaint that abandoned many of the original Complaint's assertions. Rather than the $33,845.30 account balance originally pled as fraudulent, the Amended Complaint reduced the demand to only the $12,637.77 charged after December 2007.

Further, in its first pleading CFCU alleged that a "substantial" but entirely undefined number of charges were for "luxury goods and services." The Amended Complaint put a number on "substantial," by asserting that $3,773.95 was nondischargeable under § 523(a)(2)(C)(i)(I). (Am. Compl., Docket No. 11.) In short, CFCU alleged that every single charge made on

---

[5] The Amended Complaint was filed without a motion or leave of court.

14

the card within 90 days of bankruptcy was for a luxury good or
service.

Pusateri's motion to dismiss the original Complaint was
heard on March 26, 2009. While Pusateri's arguments were
meritorious, by then the objection deadline had run and
dismissal would have put CFCU out of court. Rather than
dismissing the original Complaint, Pusateri's alternate motion
for a more definitive statement was granted. CFCU was ordered to
again redraft its Complaint. (Order on April 2, 2009, Docket No.
17.)[6]

Afterward, the credit union filed a Second Amended
Complaint on April 9, 2009. (Second Am. Compl., Docket No. 21.)
In this amended pleading the numbers did not change. CFCU again
sought a declaration that $12,637.77 of Pusateri's debt was
nondischargeable as fraud under § 523(a)(2)(A) and another
$3,773.95 nondischargeable as luxury purchases under §
523(a)(2)(C)(i)(I). (Second Am. Compl., Docket No. 21.)
Apparently responding to the Court's direction to provide
greater specificity, the complaint included a list of charges
made in each month preceding bankruptcy. (Second Am. Compl.,
Docket No. 21.) CFCU also attached copies of Pusateri's CFCU
Visa statements to the Second Amended Complaint as exhibits.

---

[6] The unilaterally filed Amended Complaint suffered from many of
the same problems as the original and was not sufficient to
serve as the pleading in the action.

(Second Am. Compl., Docket No. 21.) Otherwise, the Second Amended Complaint was as short of facts as the first two pleadings.

Not surprisingly, eight (8) days later, Pusateri filed a Second Motion to Dismiss the action based upon CFCU's failure (as required by court order) to state with particularity the specific charges that it believed to be nondischargeable luxury goods and services. (Mot. to Dismiss, Docket No. 22.) He then served CFCU with a barrage of discovery requests. (Def.'s Req. for Admis., Docket No. 23; Def.'s Interrog.s and Req. for Produc., Docket No. 24.)

CFCU responded to Pusateri's Second Motion to Dismiss with a flat assertion that its Second Amended Complaint was factually sufficient. CFCU then attempted to put Pusateri on defense by arguing procedural deficiencies in his Motion (Resp., Docket No. 25.). The credit union also accused Pusateri of over litigating the case with volleys of "pedantic Motions regarding the pleadings in this case." (Resp., Docket No. 25.) Notably, that pleading describes CFCU's approach to § 523(a)(2)(C), by asserting that all of the ninety (90) day charges are "potentially" dischargeable, although the credit union may choose to narrow them after discovery. (*Id*. at par. 4.)

Pusateri replied with similar assaults on CFCU and its attorneys (for their prior procedural errors, lack of knowledge

16

of this District's Local Rules, choice of language and of the
argumentative tone of its Response).(Def.'s Reply to Pl.'s Resp.
in Opposition to Def.'s Mot. to Dismiss, Docket No. 32.) This
pleading was highlighted by assertions of ethical violations by
Plaintiff's counsel; demands that opposing counsel be required
to read the Local Rules; and threats of Rule 9011 sanctions for
future pleading violations. Pusateri renewed his request that
CFCU be taxed with the costs of the proceeding.   Although
equally shrill to CFCU's Response, at least Pusateri's reply
(like his earlier motions to dismiss) describes in detail the
factual and legal reasons why he considered CFCU's second
Amended Complaint to be deficient.

After yet another hearing, and to move the action forward,
the Court elected not to require further amendment of CFCU's
complaint. The issue was reserved whether the Complaint as
presently constituted violated § 523(d) or Rule 9011.   (Order
dated May 18, 2009, Docket No. 33.)

On June 4, 2009, CFCU took Pusateri's deposition. (Pl.'s
Mot. for Voluntary Dismissal, Docket No. 40.) After hearing his
side of the story, and no doubt in light of the "buzz saw"
defense that it had encountered, CFCU decided to quit the
action. On June 25, 2009, the credit union moved to dismiss the
action, conceding the dischargeability issues. (Pl.'s Mot. for

Voluntary Dismissal, Docket No. 40.) However, this did not end the matter.

At this point Pusateri had incurred a large amount of costs and attorney's fees, which he believed CFCU should pay (and which he could not pay). Since CFCU's dismissal motion did not offer to reimburse these expenses, Pusateri counterattacked.

On July 27, 2009, Pusateri filed a Response which readily agreed that CFCU's claims should be dismissed, provided he and his attorney were compensated. And although the case was in discovery, Pusateri's pleading also purported[7] to lodge counterclaims against CFCU, under theories of: (a) § 523(d), (b) Rule 9011 violations, and (c) negligent and intentional infliction of emotional distress. (Response and Counterclaims, Docket No. 46.) CFCU replied to deny all liability. (Response, Docket No. 51.)

Eventually a Consent Order was worked out. Both parties wanted to file summary judgment motions on the Section 523(d)/Rule 9011 issue. They agreed that dismissal would be deferred pending a decision on this issue. Pusateri withdrew his other counterclaims.

The parties then filed the present motions for summary judgment.

---

[7] This time Pusateri filed his pleading without motion or leave of court.

D.   **The Summary Judgment Hearing.**

At hearing on the cross motions, the Court recognized that in order to decide Pusateri's cost and fee demands, the same might well have to weigh conflicting or disputed facts, and make inferences upon circumstantial evidence. Such inferences would put the matter beyond the scope of summary judgment. *See In re French*, 499 F.3d 345 (4th Cir. 2007).

However, given the high costs of this litigation, the parties were agreeable, if necessary, to the Court deciding the matter as a fact finder based upon the record, affidavits and documentary evidence. In short, the parties consented to a trial on stipulated evidence. The matter was taken under advisement in order to consider the voluminous materials.

After its review, the Court notified the parties that the determination would in fact require a 'trial' determination. Several post hearing evidentiary submissions, conference calls, and an evidentiary ruling followed in order to determine the exact contents of the evidentiary record. (Order Establishing Evidentiary Record, dated April 14, 2010, Doc. No. 99).

E.   **CFCU's Pre-filing Investigation of Pusateri's charges.**

Since the action morphed from whether Pusateri misused his credit card to whether CFCU misused this adversary proceeding,

the Court must consider to the extent possible,[8] CFCU's pre-filing review of Pusateri's account and any investigation of his circumstances.

CFCU is a credit union with roughly 125 employees and 43,000 members. (Pennycooke Depo., Docket No. 47, Ex. 2:47.) It maintains sophisticated procedures for handling a member/borrower's accounts when he files bankruptcy.

In this case, CFCU received Pusateri's Notice of Bankruptcy and routed it to an employee in its collections department. This person: 1) noted CFCU's internal account; 2) flagged the account so the debtor would not to receive dunning phone calls; 3) blocked the account from receiving any mailings; and 4) reviewed his Visa account statements. (McGinn Depo., Docket No. 47, Ex. 1:4, 7.) The employee then turned the file over to CFCU Counsel. *Id*.

Specifically, when reviewing charges on a Visa account, the collections department does not look at the total debt owed. (McGinn Depo., Docket No. 47, Ex. 1:12.)  Rather, the employee looks at the dollar amount of credit charges between sixty (60)

---

[8] As summarized more thoroughly in the Order Establishing Evidentiary Record, CFCU has invoked the attorney-client privilege as to the pre-filing actions and analysis made by its counsel, Rod Angus. (Notice of Plaintiff's Election Regarding Claims of Privilege dated February 19, 2010, Docket No. 94). Consequently, any representations or contentions made by CFCU's counsel in his affidavit and briefs, were excluded from the evidentiary record, and, will not be considered.

and ninety (90) days before bankruptcy to see if the total charges exceeded $1,000.00. (McGinn Depo., Docket No. 47, Ex. 1:12-13.) Per the CFCU procedure, if the total dollar amount of charges exceeded $1,000 in the ninety (90) days prior to the filing of bankruptcy by a CFCU member, then the matter is referred to CFCU Counsel to review for "loading up".[9] (McGinn Depo., Docket No. 47, Ex. 1:12-13, 20.)

Specific charges are not considered by the collections department employee. (McGinn Depo., Docket No. 47, Ex. 1:14.) Rather, the employee solely concerns herself with the cumulative total of charges within the ninety (90) day time frame. (McGinn Depo., Docket No. 47, Ex. 1:14, 53.)

In Pusateri's case, the collections department employee indicated that she also made a note of payments made by Pusateri on the CFCU Visa card. (McGinn Depo., Docket No. 47, Ex. 1:17, 21.)

The collections department did not investigate Pusateri's payment history on other CFCU loan accounts, such as the car loan. Under its procedures any account with a zero balance is not reviewed.[10] (McGinn Depo., Docket No. 47, Ex. 1:11-12.)

---

[9] As defined by a CFCU collections department employee, "loading up" means "excessive spending on the account or spending on the account prior to filing [bankruptcy]." (McGinn Depo., Docket No. 47, Ex. 1:13.)

[10] The collection department employee reviewing Pusateri's account was not aware that Pusateri had paid down his automobile loan to a zero balance about two months prior to filing. (McGinn Depo., Docket No. 47, Ex. 1:51.)

Nor did the collections employee review the length of the lending relationship between CFCU and Pusateri. (McGinn Depo., Docket No. 47, Ex. 1:12.)

Rather, the sole criteria employed by CFCU to determine whether to send the file to an attorney was whether Pusateri had charged more than $1,000 in the ninety (90) days prior to bankruptcy. Although his total charges for this period were, at $3,773.95, in line with historical norms for his card usage, they exceeded the $1,000 threshold. Thus, the account was referred to counsel. (McGinn Depo., Docket No. 47, Ex. 1:26.)

While CFCU's complaints alleged false pretenses, false representation and/or actual fraudulent conduct by the borrower per 11 U.S.C. § 523(a)(2)(A), CFCU's procedures did not attempt to investigate the traditional elements of fraud. Rather, CFCU's collection employee considered the use of the CFCU Visa card as wrongful and fraudulent conduct simply if the charge was not paid, and regardless of whether Pusateri made other payments on the account.[11] (McGinn Depo., Docket No. 47, Ex. 1:29.)

Similarly, that employee considered "running up" the account as fraudulent activity. (McGinn Depo., Docket No. 47, Ex. 1:30.) Of course, under CFCU's definition, anyone who

---

[11] The Court is mindful that the CFCU employee's statements regarding false pretenses, false representations, and/or fraudulent conduct is simply an employee's statement and is not considered a legal conclusion for purposes of this Court's analysis.

charged more than $1,000 in the 90 days preceding bankruptcy was guilty of "running up" and therefore guilty of fraud.

Along the same lines, CFCU's collections department manager considered the simple fact that Pusateri filed for bankruptcy as indicative that he did not intend to repay CFCU at the time he used his Visa card. (Pennycooke Depo., Docket No. 47, Ex. 2:14.)

**F.    Referral to Counsel.**

The CFCU collections department refers a member's file to CFCU counsel for the purpose of obtaining a recommendation whether to institute litigation. (McGinn Depo., Docket No. 47, Ex. 1:55.) As a matter of policy, after counsel offers his recommendation, CFCU decides whether to proceed with the proposed complaint. (Pennycooke Depo., Docket No. 47, Ex. 2:7.) Practically speaking, CFCU invariably follows its counsel's recommendation.  Since CFCU invoked attorney-client privilege, there is little evidence of what Angus did by way of review and how he came to recommend that CFCU file a dischargeability action against Pusateri.[12]

After the recommendation was made, the collections department manager and her vice president met to review Pusateri's Visa account card statements and his medical records. (Pennycooke Depo., Docket No. 47, Ex. 2:43.) Significantly, their review gave no consideration to Pusateri's: 1) payment

---

[12] Pennycooke testified that Angus recommended filing suit. *Id.*

history, 2) length of membership with CFCU, 3) any other loans (open or previous), and 4) the lack of any late charges on the account. (Pennycooke Depo., Docket No. 47, Ex. 2:45.) Instead, the decision to go forward with the Complaint was based solely on the fact that Pusateri had charged over $1,000 on the account within ninety (90) days of bankruptcy. (Pennycooke Depo., Docket No. 47, Ex. 2:42, 45.)

**G. Additional Information about Particular Charges on the Account.**

CFCU made no prior inquiry about, and gave no consideration to, the individual charges on the account, when it sued Pusateri. Still, the credit union took the position all of the charges were fraudulent and further, that each of the ninety (90) day charges represented luxury goods and services. Had it made such an investigation the credit union would have learned that even as to the larger charges, these assertions were factually suspect:

February 18, 2008 Statement:

(1) *Atlantic Landscape Supply* – $1,189.62 for landscape work done in order to prepare for listing Pusateri's house for sale. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.) (Second Amended Complaint, Docket No. 21.)

(2) *Stone-N-Counters* – $790.60 and $790.59 for house renovations to prepare Pusateri's house for listing.

(3) *Super Sod* - $147.71 for landscape work, again done to prepare Pusateri's house for listing. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

(4) *Flowers.com* – $45 for a gift of flowers. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

(5) *Garden Ridge* - $168.30 for landscape work done to prepare Pusateri's house for listing. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

March 18, 2008 Statement:

(6) *Raffaldini Vineyards* – $54.44 for wine purchased for a gift. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

(7) *Verizon Wireless* – $203 for Pusateri's cell phone bill. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

(8) *Salon Cielo* – $75 for hair salon services. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

(9) *US National Whitewater Center* – $117 for recreation entertaining a visiting niece. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

(10) *Westernunion.com Money* – $343.95 for a wire transfer to a family member so that person could come stay with Pusateri and help care for him. (Pusateri Depo., Docket No. 59, Ex. 2:67-71.)

April 18, 2008 Statement:

(1) *US Airways* – $100 for a change fee on a doctor's appointment. (Pusateri Depo., Docket No. 59, Ex. 2:66-67.)

May 18, 2008 Statement:

(1) *Mrs. Fields Gifts* – $26.94 for a gift. (Pusateri Depo., Docket No. 59, Ex. 2:65-66.)

(2) *The Meadows Bed and Biscuit* – $82 for boarding for Pusateri's dogs. (Pusateri Depo., Docket No. 59, Ex. 2:65-66.)

(3) *Lin's Buffet* – $24.68 for a restaurant charge. (Pusateri Depo., Docket No. 59, Ex. 2:65-66.)

June 18, 2008 Statement:

(1) *Riverview Inn* – $29.93 for a restaurant charge. (Pusateri Depo., Docket No. 59, Ex. 2:59-65.)

(2) *East Lincoln Animal Hospital* – $249 for emergency care for Pusateri's dog. (Pusateri Depo., Docket No. 59, Ex. 2:59-65.)

(3) *Cook Out* – $12.28 for a fast food restaurant charge. (Pusateri Depo., Docket No. 59, Ex. 2:59-65.)

(4) *Cheese and Wine Unlimited* – $231.08 for a gift. (Pusateri Depo., Docket No. 59, Ex. 2:59-65.)

(5) *U.S. National Whitewater Center* – $8.07 for a recreational center charge. (Pusateri Depo., Docket No. 59, Ex. 2:59-65.)

(6) *Last Minute Getaways* – $402.39 for travel site used to book airline flight for travel to infectious disease doctor.

(Pusateri Depo., Docket No. 59, Ex. 2:59-65.)

Post June 18, 2008 (Involuntary) Charges:

Just prior to bankruptcy, Pusateri incurred two (2) recurring charges on his CFCU Visa card without any action on his part.[13] (Pusateri Depo., Docket No. 59, Ex. 2:58.) One charge for $6.95 was an Internet fee; the second, a $139.95 fee was for a fax service. (Pusateri Depo., Docket No. 59, Ex. 2:58.) Similarly, after bankruptcy, but before notice was received by CFCU, Pusateri incurred a second recurring internet charge on the account. (Pusateri Depo., Docket No. 59, Ex. 2:57.)

**DISCUSSION**

**A.    Summary Judgment versus Trial Decision.**

Summary judgment is appropriate under Rule 7056 of the Federal Rules of Bankruptcy Procedure and Rule 56 of the Federal Rules Civil Procedure when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S.

---

[13] The closing date on the Visa statement for these charges was July 18, 2008. (Pusateri Depo., Docket No. 59, Ex. 2:58.)

317, 322-23, (1986). A party is entitled to summary judgment when the evidence, viewed in the light most favorable to the party against whom summary judgment is sought, could not lead a rational fact finder to find for the non-moving party, and the opposing party does not produce sufficient evidence to demonstrate a genuine, dispositive issue exists for trial. *Id.* at 322-24.

As noted, the remaining issues in this case turn on disputed facts and/or inferences to be drawn from circumstantial evidence. Credibility determinations, drawing inferences, and weighing evidence are jury functions and inappropriate for summary judgment. *In re* French, 499 F.3d. 345 (4th Cir. 2007)(internal citations omitted). However, with the parties' consent to a trial upon stipulated evidence, the Court may nevertheless determine the Section 523(d)/Rule 9011 issues in this ruling as a trial decision.

**B. Section 523(d) Generally.**

Code Section 523(d) provides in relevant part:

> [i]f a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d). The purpose of § 523(d) is to discourage creditors from initiating meritless § 523(a)(2) actions in the hope of obtaining a settlement from an honest debtor anxious to save attorney's fees. H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 80 (1978) U.S.Code Cong. & Admin.News, pp. 5787, 5865, 5963, 6320.

If a creditor is to be taxed with the debtor's defense costs and attorney's fees in a § 523(a)(2) case, five elements must exist:

> (1) The creditor filed a nondischargeability action under § 523(a)(2);
>
> (2) The obligation must concern a consumer debt;
>
> (3) The obligation must be found to be dischargeable;
>
> (4) the complaint must not have been substantially justified; and
>
> (5) the bankruptcy court must be satisfied that there are no special or unique circumstances, which would make the imposition of costs and attorneys' fees unjust.

*First Deposit Nat'l Bank v. Stahl* (*In re Stahl*), 222 B.R. 497, 504 (Bankr. W.D.N.C. 1998). The debtor has the burden of proving the first three elements. *Id.* The creditor must then demonstrate that the action was "substantially justified" or that the "special circumstances" exception applies. *Id.* at 504-05 (citations omitted).

Here, the parties agree that the first three elements of §
523(d) are satisfied and the remaining elements at issue are
"substantial justification" and "special circumstances."
Therefore the burden of proof is on CFCU.

### C.      Substantial Justification.

The Supreme Court defined the term "substantially justified"
as meaning "justified in substance or in the main-that is,
justified to a degree that could satisfy a reasonable person."
*Pierce v. Underwood*, 487 U.S. 552, 565 (1988).[14] The inquiry is
an objective one that ultimately turns on an assessment of
reasonableness.  *People's Bank v. Poirier* (*In re* Poirier), 214
B.R. 53, 57 (Bankr. D.Conn. 1997).

The substantially justified requirement applies both to the
filing of the § 523(a)(2) complaint and to its prosecution. *Id*.
"If at any point in the prosecution of a plaintiff's case, that
case fails to be substantially justified, the plaintiff is
subject to Section 523(d) sanctions." *Id*.  Effectively, § 523(d)
mandates that the creditor bear the debtor's reasonable costs
and attorney fees whenever "…the plaintiff proceeded with its
case past a point where Plaintiff knew or should have know that
it could not carry the burden of proof." *In re Harvey*, 172 B.R.

---

[14] *Pierce* was an action filed under the Equal Access to Justice Act ("EAJA");
the bankruptcy term "substantially justified" is derived from the EAJA.

314, 318 (9th Cir. 1994)(citing *Manufacturer's Hanover v. Hudgins*, 72 B.R. 214, 220-21 (N.D. Ill. 1987)).

These principles were applied in *FIA Card Services, N.A., v. Flowers,* (*In re* Flowers), 391 B.R. 178, 180 (M.D. Ala. 2008). Flowers, an individual with only a modest income derived primarily from Social Security benefits, took a $4,000 cash advance on his credit card. Ninety-nine (99) days later, Flowers filed for bankruptcy, having made no payments on the debt. *Id.*

FIA, Flower's card issuer, then filed a § 523(a)(2)(A) dischargeability action based upon that cash advance and Flower's failure to pay. *Id.* The adversary proceeding was filed without FIA attending Flower's § 341 meeting, conducting a Rule 2004 examination, or undertaking any investigation of whether there was any evidence to support its fraud allegations. *Id.*

Hoping to prove inability to repay the loan, FIA relied solely on the fact that Flowers had in fact failed to perform. *Id.* at 182. Similarly, FIA pled fraudulent intent by Flowers, but presented no evidence to demonstrate that intent, apart from Flowers' failure to pay the debt. *Id.* at 182. The Bankruptcy Court was unpersuaded, since treating simple failure to pay as evidence of an intentional misrepresentation would transform every simple breach of contract into a fraud case. *Id.* The Court instead focused on Flowers' testimony, from which it found that "the Debtor used his best efforts to repay his creditors

and would have done so but for his extraordinarily serious health problems." *In re* Flowers, 2007 WL 2819542, at *4 (Bankr. M.D. Ala. 2007). The bankruptcy court held FIA's debt dischargeable and then taxed FIA with Flowers' costs and fees under § 523(d). *Id.*

In assessing fees against the creditor, the Bankruptcy Court rejected FIA's 'sue first, ask questions later' approach as being incompatible with the Code. At least in theory, FIA's action might have been substantially justified if it had "conduct[ed] some kind of pre-filing investigation to determine whether there was evidence to support fraud by Flowers." *In re* Flowers, 391 B.R. at 183; *See Bridgewater Credit Union v. McCarthy* (*In re* McCarthy), 243 B.R. 203, 209 (1st Cir. BAP 2000) ("The plaintiff must show that it reviewed its legal position before filing suit to determine if it is substantially justified.").

However, FIA had made no such inquiries, relying instead upon supposition and unsupported allegation. As the *Flowers* court correctly concludes, "FIA's total failure to make any effort to inquire into Flower's personal and financial situation makes any reliance upon this implied representation both unreasonable and unjustified." (*In re* Flowers), 2007 WL 2819542, at *2.

32

The case of *In re* Poirier provides further illumination on the proper application of the "substantially justified" standard in § 523(a)(2) dischargeability cases. *In re* Poirier, 214 B.R. at 53. There, prior to filing, the debtors had used "balance transfer checks" on their credit account to retire balances owed to other creditors. *Id*. at 54. When the Poirier's later filed bankruptcy, their card issuer objected to dischargeability. The creditor maintained that the debtors had fraudulently used their credit account on the eve of bankruptcy to convert secured and/or non-dischargeable debts into a single unsecured, dischargeable debt. *Id.*

Again, the dischargeability action was filed without the card issuer conducting a Rule 2004 exam or undertaking any pre-filing investigation. Rather, the creditor was relying solely on the timing and outward appearance of the charges. *Id.*

Despite the appearances, the debtors' trial testimony clearly refuted these suggestions. Each disputed charge was honestly incurred in an effort to consolidate debts so as to minimize finance charges, interest and penalties. *Id*. At 54-55. Based on that testimony and upon the documentary evidence presented, the Bankruptcy Court concluded that none of the disputed charges had been incurred with fraudulent intent.

Of course, both that testimony and the documentary evidence were available to the creditor prior to the suit, had it only

sought to obtain them. By simply setting a Rule 2004 exam, the card issuer could have ascertained whether its initial doubts were correct. Since it did not attempt to confirm its suspicions before filing the dischargeability objection, the creditor's action was deemed not to be substantially justified. *Id.* at 58.

Along the same lines, the creditor's failure to conduct discovery by 2004 examination or oral deposition of the only critical witness prior to trial terminated whatever "special circumstances" protection it enjoyed by virtue of the "unexplained" nature of the disputed charges. *Id.* at 59 (citing *First Card v. Leonard* (*In re* Leonard), 158 B.R. 839, 846 (Bankr. D. Colo. 1993)); *see also* (*In re* Harvey), 172 B.R. at 319 (awarding fees under § 523(d) where the "non-dischargeability action was very flimsy, and that there was basically no evidence at all, or very slight evidence, of the possibility of fraud.")).

**Was CFCU's Action Substantially Justified?**

To determine whether CFCU's action against Pusateri was substantially justified, the individual counts of its complaint(s) will be compared to the evidence presented in the record.

*i.*   ***Section 523(a)(2)(A)- Debts for obtaining money, property, or services by false pretenses, misrepresentations, or actual fraud.***

Code Section 523(a)(2)(A) states in part:

A discharge ... of this title does not discharge
an individual debtor from any debt –

(2) for money, property, services..., to the
extent obtained by –

(A) false pretenses, a false
representation, or actual fraud, other
than a statement respecting the
debtor's or an insider's financial
condition.

11 U.S.C. § 523(a)(2)(A).

CFCU maintained in its original action that its entire
$33,845.30 debt, including the charges made before Pusateri
became disabled, was nondischargeable under this provision.   It
was incumbent upon CFCU to establish that each of the
outstanding charges on the account was based upon:

(1) a fraudulent misrepresentation;
(2) which induced CFCU to act or refrain from acting;
(3) which caused harm to CFCU; and
(4) upon which CFCU justifiably relied.

*See Foley & Lardner v. Biondo* (*In re* Biondo), 180 F.3d 126, 134
(4th Cir. 1999). As the party challenging the dischargeability
of debt, CFCU had the burden of establishing each element by a
preponderance of evidence.   *See Grogan v. Garner*, 498 U.S. 279,
291 (1991).

A statement is a misrepresentation only if the debtor's
representation was known to be false or else was made recklessly
without knowing whether it was true or false.   *Boyuka v. White*

35

(*In re* White), 128 Fed. Appx., 994, at *3 (4th Cir. 2005) (unpublished opinion)(citing *In re* Woolley, 145 B.R. 830, 834 (Bankr. E.D. Va. 1991)).

Further, a debtor's misstatement of intention is only "fraudulent if he does not have that intention at the time he makes the representation." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting Restatement (Second) of Torts § 530(1) (1976)). Fraudulent intent may be proven either by direct or circumstantial evidence.

In the case of credit card debt, objective or circumstantial factors inherentially demonstrating intent include: (a) length of time between charges, (b) extent to which the credit limit was exceeded, (c) debtor's employment or prospects of employment, (d) age and sophistication of the debtor, (e) number and amount of charges, (f) financial condition of the debtor at the time of the charges and (g) whether there was a sudden change in buying habits. *Am. Express Travel Related Serv. Co., Inc. v. Henein*, 25B.R. 702, 706 (E.D.N.Y. 2001)(citations omitted).

This Court discussed the § 523(a)(2)(A) intent requirement in *In re* Stahl. In *Stahl,* Judge Wooten stated:

> If a credit card is used with no intention of attempting to pay the debt, there is a sufficient basis to deny discharge under § 523(a)(2)(A).
>
> However, it is quite another matter where a person in

> financial distress incurs indebtedness before
> realizing that his or her financial condition is
> hopeless and that bankruptcy is dictated by the
> circumstances which exist at the time of such
> realization.

*In re* Stahl, 222 B.R. at 497 (citing *In re* Simos, 209 B.R. 188

(Bankr. M.D.N.C. 1997)).

In the present case, the evidentiary record grossly fails to

support CFCU's contention that each of these charges was the

product of fraudulent misrepresentations under § 523(a)(2)(A).

There is a total dearth of evidence, in this record indicating

Pusateri did not intend to pay CFCU when these charges were

made. As with the *Flowers* and *Poirier* cases, the only real

evidence in this regard is the fact that Pusateri did not pay

the debt, and that we know is legally insufficient.

In fact, CFCU had no knowledge of Pusateri's intentions at the

time its action was filed and was indifferent to those

intentions. As noted above, CFCU's sole criteria in deciding

whether to file this dischargeability complaint was whether

Pusateri charged more than $1,000 in the ninety (90) days prior

to bankruptcy.

By contrast, Pusateri's evidence strongly suggests that he

always intended to pay CFCU, and would have, but for his illness

and his inability to sell his home. As Pusateri's illness did

not abate, he merely lost the ability to make good on his

intentions.

One compelling piece of evidence regarding Pusateri's intention to pay is the fact that he voluntarily chose to retire CFCU's undersecured car loan balance within 90 days of bankruptcy. Had he intended to defraud CFCU this decision would not make financial sense. Instead it is a reflection of an individual acting responsibly to pay his creditor. It is telling that CFCU disregarded this loan repayment when considering whether to file this action and when it continued to press this action even after Pusateri brought this information to its attention.

Pusateri's intention to repay his creditor and his belief that he had the ability to do so, were further evidenced by his decision to list his house for sale at a "quick sale" discounted price ($1.39 million versus an $1.57 million sales comp value or a $1.609 million cost value). Again, we see Pusateri acting responsibly to pay CFCU and his other creditors.

Finally, there is the fact that Pusateri had a twelve year exemplary borrowing history with CFCU. He had never been late, much less missed a payment. This fact should have strongly contradicted any suspicion by CFCF that the credit charges were made without an intention to repay them.

In short, had CFCU made such a review of its own accounts or had it sought a pre-filing 2004 examination of this debtor, the alleged "unexplained nature" of these charges or the "facial

appearance of loading up," would have been refuted. Since CFCU chose to file and prosecute this action with no effort to ascertain the true facts, and since the evidence does not to support its fraudulent misrepresentation charges, the credit union was not substantially justified in bringing this dischargeability complaint under § 523(a)(2)(A).

### ii. Section 523(a)(2)(B)- Debts for obtaining money, property, or services by use of a statement in writing that is materially false.

To establish a cause of action under § 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that the debt was obtained by the use of a statement:

(1)  in writing;
(2)  that is materially false;
(3)  respecting the debtor's or an insider's financial condition;
(4)  on which the creditor to whom the debtor is liable for money, property, services or credit reasonably relied;
(5)  that the debtor caused to be made or published with intent to decide.

11 U.S.C. § 523(a)(2)(B).

A written statement is materially false if it paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. *Cmty. Bank of Homewood-Flossmoor v. Bailey* (*In re* Bailey), 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992).

CFCU's Complaint makes the blanket assertion that Pusateri furnished it with written credit applications and supporting documentation that contained false statements of his income. CFCU further avers that Pusateri failed to make full and accurate disclosures of his liabilities and financial obligations as of the date the credit application was published. Lastly, CFCU alleges that the credit applications were false and misleading in other material aspects.

CFCU's claim under § 523(a)(2)(B) is a bold legal assertion devoid of factual support. There are no factual averments in CFCU's original Complaint stating what false applications and financial documents were provided to it by Pusateri; when these were provided; or in what ways these documents were false. Just how these phantom documents were relied upon by the credit union is not explained. Nor do we know how they proximately caused CFCU a loss. Such conclusory allegations do not meet the requirements of FRBP Rule 9; nor do they meet the requirements of § 523(d).

Further, since the parties lending relationships were so longstanding, one would imagine that any such applications or documents must have been provided years before bankruptcy.[15]

---

[15] Further belying the assertion that CFCU was misled by a false financial statement in extending credit to Pusateri is the fact that when Pusateri applied for a car loan, the written loan application prepared for him by CFCU's employees listed both his monthly salary and other sources of income as "N/A."

Since Pusateri successfully repaid all of his obligations to CFCU for more than a decade, it is difficult to imagine how Pusateri could have defrauded CFCU with a false financial document.

In fact, the total lack of merit of this count was aptly demonstrated in how quickly CFCU abandoned it. When Pusateri's original Motion to Dismiss was filed, CFCU unilaterally amended its Complaint to delete sizeable portions of its pleading. One of the assertions dropped was the § 523(a)(2)(B) count.

Obviously, CFCU was not substantially justified in bringing a dischargeability complaint under § 523(a)(2)(B).

### iii.    *Section 523(a)(2)(C)(i)(I) – luxury goods or services.*

If there was a meritorious topic for a dischargeability action by CFCU against Pusateri, it would have been as to the ninety day "luxury" charges under § 523(a)(2)(C)(i)(I). However, even as to these, CFCU sued and prosecuted this action without regard to merit. Specifically, it sued not just as to purchases of "luxury goods or services," but to all of Pusateri's 90 day charges.

Section 523(a)(2) excepts from discharge any debt:

(2) for money, property, services..., to the extent obtained by –

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B)    for   purposes   of   subparagraph   (A)   of   this
paragraph,   consumer   debts   owed   to   a   single   creditor
and   aggregating   more   than   $1,225   for   "luxury   goods   or
services"   incurred   by   an   individual   debtor   on   or
within   60   days   before   the   order   for   relief   under   this
title   ...are   presumed   to   be   nondischargeable;   "luxury
goods   or   services   reasonably   acquired   for   support   or
maintenance   of   the   debtor   or   a   dependent   of   the
debtor...

11 U.S.C. § 523(a)(2).    "Luxury goods" is not a defined

term in the Bankruptcy Code.    However, courts assessing which

items qualify as "luxury goods" have considered whether the

items are "extravagant, indulgent, or nonessential" or

alternatively "whether the items purchased served any important

family function and evidence some fiscal responsibility."

*Hudson Belk Co. v. Williams* (*In re* Williams), 106 B.R. 87, 89

(Bankr. E.D.N.C. 1989)(citations omitted). The assessment must

be made on a case-by-case basis, as determining "luxury goods"

involves a sliding scale. *See id.*

Items purchased as gifts are typically considered "luxury

goods" within the meaning of § 523(a)(2)(C)(i)(I). *Id.* at 87.

*See also GE Money Bank v. Riccardi* (*In re* Riccardi)(Ad. Pro. No.

05-0154)(Bankr. E.D.N.C. 2006)(unpublished opinion)(patio

furniture purchased as a gift serves no important family

function and may be considered indulgent and nonessential,

whereas fencing, tools, nails, caulk, siding accessories, and

outdoor lighting items purchased in connection with the debtor's

home improvement business are not).

In the present action, most of the big ticket charges on Pusateri's account were incurred more than ninety days before bankruptcy and were not included in this count.

For a bare handful of the charges, the "luxury" nature of the items or services purchased is clear. These include, by example, the $26.94 charge to Mrs. Fields Gifts (gift) and the $231.08 charge to Cheese and Wine Unlimited (gift). CFCU might have been justified in bringing a § 523(a)(2)(C)(i)(I) objection as to these charges.

Conversely, a larger group of ninety (90) day charges can be clearly viewed as not constituting "luxury goods or services." Examples include the three small dollar restaurant charges, $24.68 to *Lin's Buffet,* $29.93 to the *Riverview Inn*, and $12.28 to The *Cook Out,* a fast food restaurant. CFCU was not substantially justified in bringing these charges.

Between the two extremes there is a much larger group of charges, which may be "luxury" charges, depending on the attendant circumstances. A good example is the $402.39 charge to Last Minute Getaways. Here the merchant's name suggests a vacation, making it a potential luxury purchase. However, scratch the surface a bit and this charge was for airfare when Pusateri traveled to meet with a specialist about his back. The airfare was purchased through a travel agent in order to obtain

a cheaper, discounted fee. Despite its outward appearance, for Pusateri the expenditure was a necessity, not a luxury.

Other indeterminate ninety (90) day charges include, but are not limited to, the $100 *US Airways* charge (change fee on a doctor's appointment), the two pet expenses, ($82 *The Meadows Bed and Biscuit* fee (dog boarding) and $249 to the *East Lincoln Animal Hospital* (emergency care); the $6.95 internet fee; and the $139.95 fax service fee. These charges might represent indulgences. They might be personal necessities. For this group of charges, it was incumbent upon CFCU to make further inquiry before filing suit under § 523(a)(2)(C).

The inquiry as to indeterminate charges need not require the formality or expense of a 2004 exam or an oral deposition. CFCU could have: (1) contacted debtor's counsel by email, letter, or phone to request explanation and substantiation of these charges, (2) attended Pusateri's § 341 meeting to ask for further explanation under oath; and/or (3) sought a further extension of time to object to discharge/dischargeability in order to make additional inquiries.

Unfortunately, CFCU was not focused on these individual charges, and made no effort to cull out non-qualifying charges. Instead, because the total ninety (90) day charges exceeded $1,000, CFCU sued as to all of them.

In theory, there might have been a very limited suit under § 523(a)(2)(C) that CFCU could have justifiably filed. However, this small potentiality does not justify CFCU suing on all of the ninety (90) day charges, regardless of merit.

**D. Boiler plate Complaints, Indicative of Proscribed Creditor Practices.**

As noted, the express purpose of § 523(d) is to discourage meritless actions by a creditor against a debtor for the purpose of forcing a settlement. Such actions are often characterized by "boilerplate" complaints that are long on legal accusations and very short on supporting factual averments. CFCU's complaint(s) falls squarely into this category. Through three revisions of the complaint, the only factual allegations against Pusateri are confined to (a) his account balance; (b) a listing of the charges made during in the ninety (90) days before bankruptcy; and (c) copies of the account statements.

Worse, CFCU's propensity towards employing boilerplate complaints does not appear confined to this action. If one compares the present complaints to six other recent complaints drafted by Mr. Angus and filed by CFCU in other bankruptcy courts,[16] several common "boilerplate" assertions emerge:

(1) *Referring to a § 523(a)(2)(A) count*- "Defendant has made other material misrepresentations to the Visa Account

---

[16] These actions were filed between December 1, 2008 and March 31, 2009.

[and other accounts with respect to other debtor defendants]. Plaintiff has relied on Defendant's misrepresentations to its determent." (Motion for Summary Judgment For an Order Granting Attorney's Fees, Cost and Expenses Under 11 U.S.C. § 523(d) and 28 U.S.C. § 1927, Ex: G, Docket No. 59).

(2) *Referring to a § 523(a)(2)(B) count* – "The Credit Application furnished by Defendant was materially false in that it significantly overstated the amount of Defendant's income from employment and other sources as of the date said Credit Application was published." *Id.*

(3) *Referring to a § 523(a)(2)(B) count* – "The Credit Application furnished by Defendant was materially false in that it did not make full and accurate disclosure regarding the extent of Defendant's liabilities and financial obligations as of the date said Credit Application was published." *Id.*

(4) *Referring to a § 523(a)(2)(B) count* – "The Credit Application was false and misleading in other material respects." *Id.*

(5) *Referring to a § 523(a)(2)(C)(i)(I) count* – "A substantial portion of the charges on the Visa account ... represent charges incurred by Defendant for luxury goods or services less than 90 days prior to the filing of the

Petition. Such charges are presumed to be nondischargeable." *Id.*

Substantially identical 'legalese' is found in each of these complaints. Each complaint is lacking in specific, supporting factual allegations. Finally, despite the broad legal accusations pled against the debtors in these complaints, in practice CFCU's sole criterion for filing is the cumulative amount of card charges made by the borrower in the ninety (90) days preceding bankruptcy.

Taken together it is clear that CFCU routinely sues first, and then if pressed, determines whether it has a meritorious action against the debtor. If not it retreats. This is an entirely inappropriate procedure. The Code requires a creditor to take steps, **prior to filing suit**, to ascertain that the filing of such adversary action is "substantially justified." *See* S.Rep. No. 65, 98th Cong., 1st Sess. 58, 59 (1983).

For all of the aforementioned reasons, CFCU's filing and prosecuting this action cannot be seen as "substantially justified."

**E.   "Special Circumstances – Attorney's fees.**

While CFCU argues "special circumstances" make it unfair to tax it with Pusateri's costs and attorney's fees no such circumstances are identified, apart from the (high) level of those fees. CFCU suggests that Pusateri and his counsel drove

the parties' litigation costs to excessive heights because they defended the adversary proceeding in an overly aggressive manner.

By contrast, CFCU sees its prosecution as expeditious, efficient, and cost effective. By example, CFCU notes that before filing its motion for a voluntary dismissal, it did not file any procedural motions in the cause. Further, the only discovery that CFCU attempted was taking Pusateri's deposition.

There is considerable irony in these assertions. Doubtless, Pusateri's costs and attorney's fees are lamentably high for a consumer dischargeability action. However, Pusateri did not file this action, CFCU did. CFCU chose the counts and averments to be made (or more aptly those to be omitted) in the complaint(s).

Since CFCU filed a generally meritless action, it cannot fault the debtor for failing to accede to its demands and instead choosing to fight back.

Similarly, CFCU cannot blame Pusateri for its own dogged insistence on prosecuting the action even after Pusateri had given it sufficient information to know the action was ill founded (if it did not realize this at the outset). This persistence and some very bad pleadings, greatly increased the costs of this action, as the parties waded through repeated motions to dismiss, revisions of the complaint, objections and hearings. Again, CFCU cannot reasonably object to the debtor's

reasonable fees for resisting its poorly drafted complaints.[17]
That defense was meritorious and entirely successful as
demonstrated by charting the progress of the action:

| Pleading | Legal Allegations | Prayer for Relief |
|---|---|---|
| Original Complaint | Count 1:<br><br>§523(a)(2)(C)(i)(I);<br><br>§ 523(a)(2)(A)<br><br>Count 2 –<br><br>§ 523(a)(2)(B) | Entire Amount of Debt<br><br>Owed to CFCU or<br><br>**$33,845.30** |
| Amended Complaint | Count 1:<br><br>§ 523(a)(2)(C)(i)(I);<br><br>§ 523(a)(2)(A) | Under § 523(a)(2)(A),<br><br>Debt Incurred after<br><br>1/1/08= **$12,637.77;**<br><br>Under<br><br>§ 523(a)(2)(C)(i)(I)=<br><br>$3,773.95.<br><br>(latter sum<br><br>is subsumed in<br><br>the former) |
| Second Amended<br>Complaint | Count 1:<br><br>§ 523(a)(2)(C)(i)(I);<br><br>§ 523(a)(2)(A) | Under § 523(a)(2)(A),<br><br>Debt Incurred after<br><br>1/1/08 - $12,637.77; |

---

[17] In contrast to the credit union's pleadings, up to the point that CFCU
attempted to withdraw the action, the Debtor's pleadings were specific and
his objections were on point.

| | | Under $\S\ 523(a)(2)(C)(i)(I) =$ **$3,773.95.** |
|---|---|---|
| Pl.'sMotion to Dismiss | Conceded | **$0** |

### F.    The Post Withdrawal Period.

Of course, the action did not end there. For six months after CFCU attempted to withdraw the action, the two sides waged an increasingly virulent war as to whether CFCU would be required to reimburse Pusateri for his costs and attorney's fees.

Pusateri was entitled to seek his attorney's fees even after the credit union attempted to withdraw the action. The congressional purpose behind § 523(d) demands that the debtor be made whole for defending an ill-conceived action, even if the plaintiff dismisses the suit. Otherwise, the debtor's counsel would go unpaid, and the next time a spurious action is filed against a debtor, the attorney would be unwilling to represent him.[18]  The debtor's reasonable costs pursuing its § 523(d) claim are compensable. 11 U.S.C. § 523(d)("the court shall grant

---

[18] It should be noted that this Court does not require bankruptcy counsel to represent the debtor in adversary proceedings of this kind. *See* Local Rule 2091-1(a)(1).

judgment in favor of the debtor for the costs of, and reasonable attorney's fee for, the proceeding…").

G. **The Two Attorneys Unnecessarily Inflated the Parties' Litigation Costs.**

However, one cannot ignore the fact that the attorneys drove up the cost of this litigation. Early in this action, well before CFCU attempted to walk away, the two lead attorneys lost perspective.[19] Each perceived the other as guilty of unreasonable tactics. In reply, each redoubled his own efforts. Along the way, a mountain was crafted out of a molehill. To call the action a molehill would overlook the lack of merit in the suit, nevertheless the problem was overinflated. The growth was not due to seismic activity, but instead attorney intransigence.

This suit was never very civil, but as it morphed from dischargeability objection into an attorney's fee dispute, the two attorneys became increasingly hostile. In a district where professional courtesy is the expected norm, no quarter was given between the two attorneys.

Not surprisingly, the parties' litigation costs reached outrageous levels. Even without a live trial, Pusateri's total costs and attorney's fees through January 12, 2010 were

---

[19] Of the three attorneys, only CFCU's local counsel, Heather Culp, appeared to keep her composure throughout.

$62,167.75, a sum nearly twice the original amount sought by CFCU in the action.[20]

While both lead attorneys contributed to the mountain making, the focus of § 523(d) is on the reasonableness of the debtor's attorney fees. Thus, without suggesting that CFCU's counsel acted more reasonably, we will confine our review to Badger's work.

A clear example of attorney overzealousness is found in the counterclaims Pusateri filed against CFCU under: 1) U.S.C. § 1927 (vexaciously multiplying proceedings); 2) FRBP Rule 11 and 11 U.S.C. § 105(a)(the bankruptcy court's omnibus powers); and 3) a claim for damages under state emotional distress theories.

These counterclaims were filed after the pleadings were complete and the case was in discovery. The counterclaims were also filed without leave of court as required by Rule 7013. F.R.B.P. 7013. And they were filed at a time when the Plaintiff was attempting to dismiss the action. The counterclaims were late, improperly filed and at the most inopportune time opened a new front in the litigation.

These counterclaims were also needless. Under § 523(d), Pusateri had a remedy available to make him whole for this improperly filed action. He had already invoked this remedy in

---

[20] Actually, even this is less than the full amount in that it excludes Badger's base case work and the legal work on the non-Section 523(d)/Rule 9011 counterclaims ($3,798.75).

his Answer and Motion to dismiss, so there was not need to replead it. Further, since § 523(d) provides a specific remedy for an unfounded § 523(a)(2) action, there was no need to invoke these other more generic causes of action. And even if a Rule 9011/Section 105 claim was warranted, this Rule counterclaim was asserted without Pusateri first demanding and allowing an opportunity to CFCU to withdraw the offensive pleading. F.R.B.P. 9011(c)(1). Rather, the debtor inappropriately attempted to invoke the Rule 11 subpart that permits a court to take unilateral action. F.R.B.P. 9011(c)(2).

This was overkill. In his Affidavit, Mr. Badger properly eschews any claim for fees relating to the non-section 523(d)/Rule 9011 counterclaims. He should not have made a claim for repleading § 523(d) or mis-invoking Rule 9011.

A second example of overzealous attorney work stems from these counterclaims. Immediately after filing the counterclaims, Pusateri's counsel moved to depose his opponent, Mr. Angus, ostensibly so he could allocate blame for the action between the credit union and its counsel.

The first problem with counsel's motion is that it needlessly attempts to turn the opponent's counsel into a case witness. *Spivey v. U.S.*, 912 F.2d 80, 84 (4th Cir. 1990) ("it is elementary that counsel may not participate both as an advocate and as a witness, absent special circumstances."). Since the

debtor already had a method to recover his costs and fees from CFCU, he had little need to allocate between CFCU and its counsel.

Further, the effort to depose opposing counsel was unlikely to succeed. CFCU was all but certain to invoke the attorney-client and work product privileges to shield the proposed inquiries about what Angus did in reviewing the file and recommended to his client.

Since Pusateri had no need to broaden the action in this fashion, did not obtain leave of court to make the underlying counterclaims, and did not comply with the Rule 9011 demand preconditions, the attempt to depose Angus was largely an action of vindication.

Apart from attorney "oneupsmanship," it also appears that a lesser but contributing factor to the high level of attorney's fees was the strong likelihood that CFCU was going to be footing the bill. This action was so weak, and the plaintiff so out of step with established law in its "shoot first, then aim" approach, that even early on, one could assume that there would be a § 523(d) fee shift. With CFCU rather than Pusateri, bearing the costs, lengthy pleadings, briefs, discovery, and illustrative evidence, by the Debtor became tenable.

For example, early in this action, Pusateri served CFCU with a litany of written discovery requests: Requests for

Admissions (Docket No. 23), Interrogatories (Docket No. 24), Requests for Production of Documents (Docket No. 24). Then when the case became a fee shifting dispute, Pusateri deposed three of CFCU's employees and attempted to depose CFCU's counsel (Docket no. 49).

Each of these acts is individually appropriate. However, in a case of this size (Plaintiff's demand was only $12,637.77 or $0 at the time these discovery efforts were undertaken), doing all of this would normally be cost prohibitive. This is particularly true since the depositions were conducted in Virginia and required Pusateri's counsel to travel.

Further, when the Virginia depositions were taken, both debtor's counsel and his paralegal attended. The paralegal's services may have been helpful to the case. However, had Pusateri been the sole source of payment for the attorney's bill, it is doubtful that the paralegal would have attended.

The fact that the creditor may have an unjustifiable complaint does not give the debtor the right to go to the inth degree to win the case. The legal fees must be reasonable.

Beyond these examples it is almost impossible to separate the reasonable from the unreasonable service, or to separate attorney oneupsmanship from legitimate billing. Accordingly, there is no way to precisely quantify or to apportion the excess.

However, even in an unjustifiable action with a stubborn opponent, when the debtor's defense costs stand at double the original demand amount, the Court must conclude they are excessive. A bankruptcy court cannot disregard the disproportionate level of defense costs as compared to the amount sought to be held nondischargeable. *See Parsons v. AT&T Universal Card Services Corp.* (*In re* Parsons), 217 B.R. 959 (Bankr. M.D. Fla. 1998)(finding debtor's attorney's fees in the amount of $6,823.50 unreasonable when compared to a nondischargeability claim for a $5,193.04 debt).

It would be too much to suggest that every § 523(d) fee request be less than the original amount in controversy. Where the debt is small, (say $10,000 or less), this could make defense of the action untenable, and thereby thwart the purpose of § 523(d). Rather, the reasonableness determination must be made on a case-by-case basis. *In re* Gills Creek Pkwy Assoc., L.P. 194 B.R. 59, 64 (Bankr. D.S.C. 1995); *In re* Reid, 854 F.2d 156 (7th Cir. 1988).

Here however, with a fee request that dwarfs the amount in controversy, which itself was a significant sum, the undersigned can safely say that the defense cost was unreasonable.

Lacking any precise way to weed out the unreasonable from the necessary, we can only rely on overall impressions. Having observed the parties at every stage of this litigation, the

Court concludes that forty percent (40%) of the debtor's legal costs were occasioned by CFCU filing and then stubbornly clinging to a meritless lawsuit.

In the Court's estimation, sixty percent (60%) of these expenses arose from over-litigating by, and needless warring between, the lead attorneys. In their battle, each was equally responsible for the over-litigating, thus thirty percent (30%) of the debtor's legal costs is attributable to each.

Pusateri is therefore entitled to recover seventy percent (70%) of his costs and fee request or $43,517.43 ($62,167.75 x .70) from CFCU.

**IT IS THEREFORE ORDERED:**

1. CFCU's Motion for Summary Judgment is **DENIED.**

2. Pusateri's Motion for Summary Judgment for an Order Granting Attorney's Fees, Costs, and Expenses is **GRANTED IN PART.**

3. As a trial verdict, under § 523(d), CFCU is taxed with Pusateri's costs and legal fees, costs in the amount of $$43,517.43.

4. CFCU's Motion to Dismiss its claims against the Debtor is **GRANTED.**

**This Order has been signed**      **United States Bankruptcy Court**
**electronically.  The judge's**
**signature and court's seal**
**appear at the top of the Order.**